## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA
## OMAHA DIVISION

|  |  |  |
|---|---|---|
| Light of the World Gospel Ministries, Inc. | ) | Case No. _____ |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | **VERIFIED COMPLAINT AND** |
|  | ) | **DEMAND FOR JURY TRIAL** |
| Village of Walthill, Nebraska, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

_____

Plaintiff Light of the World Gospel Ministries, Inc. ("**LOTW**" or the "**Church**"), for its Complaint against Defendant Village of Walthill ("**Walthill**" or the "**Village**"), states and alleges as follows:

### INTRODUCTION

1.　　Since 2013, Walthill has unlawfully prohibited LOTW from constructing a new building at which the Church can safely assemble for worship. LOTW desperately needs a new facility for its growing congregation. Yet, without any legitimate basis or reason, and as a result of animosity, self-dealing, discriminatory motives, and favoritism of other viewpoints, religious beliefs, and groups, the Village has unlawfully kept LOTW from constructing a new church building on properties on which the Village determined LOTW could safely and appropriately build a new worship facility in January 2014.

2.　　The Village enacted a new building permit ordinance, zoning ordinance, and created a comprehensive plan targeting LOTW's efforts to build a new church. Within one week after a Church's attorney sent a letter raising concerns with the Village's conduct, and after

consulting with the Village Attorney, the Village unlawfully retaliated by scheduling the Church's previously approved building permit for revocation.

3.      The Village revoked the Church's previously approved building permit in retaliation for the Church's protected conduct and citing false public statements disparaging LOTW's alleged religious beliefs and practices.  For the next three years, the Village refused to grant multiple Church requests for demolition permits, again without any lawful basis, and cited the alleged irrational opinions of a favored organization.  Finally, in September 2017, the Village denied the Church's application for a special use permit that would have allowed the Church to worship.  The Village denied the permit without a single finding, without conducting a single study, and based on no evidence whatsoever.

4.      LOTW has patiently suffered through the Village's unlawful acts, not seeking to engage in a dispute.  But the Church can wait no longer.  Its needs are too great.  The Church now seeks the relief from this Court which it has needed since July 2014.

## THE PARTIES

5.      Walthill is a village and municipal corporation located in Thurston County, Nebraska.

6.      LOTW is a religious assembly—an independent Christian church—organized as a Nebraska non-profit corporation.

7.      LOTW's current principal place of worship is a building located at 214 Main Street in Walthill (this building and property, LOTW's "**Current Building**").  Exhibit A attached hereto is a satellite photograph showing the location of the Church's Current Building and certain other properties referenced below.

2

8.      LOTW has a substantial and pressing need for a new building at which to assemble and worship, however, the Village has not allowed the Church to build a new church building in violation of the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act ("**RLUIPA**").

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Walthill as a municipal corporation within the state of Nebraska.

10.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under (1) the First and Fourteenth Amendments to the United States Constitution; (2) 28 U.S.C. § 1343(a)(3), as it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; (3) 28 U.S.C. § 1343(a)(4), as it seeks to recover damages and secure equitable relief under Acts of Congress, specifically RLUIPA, 42 U.S.C. § 2000cc, *et seq*.; and (4) 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b), as it seeks an award of attorneys' fees; under 28 U.S.C. § 2201(a), as it seeks to secure declaratory relief; and under 28 U.S.C. § 2202, as it seeks to secure permanent injunctive relief and damages.  This Court has supplemental subject matter jurisdiction over the state law claims in this case under 28 U.S.C. § 1367.

11.     Venue is proper in the United States District Court for the District of Nebraska under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

## LOTW'S RELIGIONS MISSION AND EFFORTS TO BUILD
## A NEW CHURCH BUILDING FOR ASSEMBLY AND WORSHIP

12.     The Church's purpose and vision is to worship God and Jesus Christ, to reach those who do not know Jesus Christ, and to challenge and encourage those who do know Him.

13.     LOTW carries out its purpose and vision, in part, by regularly assembling to collectively worship, including through prayer, singing, and preaching.

14.     LOTW is a growing, diverse, and multi-cultural congregation with a vibrant youth group.

15.     LOTW has a substantial need for a new church building.  Many of the Church's worship services in its Current Building are crowded and uncomfortable for attendees.  Pictures showing the exterior and interior of LOTW's Current Building are attached hereto as Exhibit B.

16.     As shown in the first picture at Exhibit B, a large portion of a wall of the building adjacent to LOTW's Current Building is precariously and unsafely leaning over the Church's Current Building.  See also, Exhibit C, showing pictures of this building.

17.     LOTW's Current Building has a worship space of approximately 1,250 square feet in which 130 or more worshipers regularly gather.

18.     Approximately 200 people attend all LOTW events many weeks.  These people could not all meet together in LOTW's Current Building.

19.     LOTW's Current Building has minimal, poor-quality space in which the Church provides education programs and other children's programming.  Up to 20 children gather in a Sunday School room that is approximately 11 by 12.5 feet.  Not all of the children that regularly attend LOTW can fit into the single Sunday school room in LOTW's Current Building.

20.     Prospective members desiring to worship with LOTW have chosen not to join or worship with the Church due to the overcrowded condition of LOTW's Current Building.

21.     LOTW's Current Building prevents and has prevented the Church from growing, and so directly hinders LOTW from living out its sincerely held beliefs.

22.     LOTW congregants have stopped attending the Church because its Current Building is overcrowded.

23.     Potential members of LOTW have been inhibited from coming because there is no room or the only room is immediately in the front of the service.

24.     Since at least 2013, LOTW has explored alternatives to obtain or build a new church building.

25.     Meeting in a central location in Walthill for worship is important to LOTW because the Church draws congregants and attendees from the rural areas and communities surrounding Walthill.

26.     LOTW's location is also important because the Church desires to have an accessible and visible location to serve the Walthill community and to attract individuals who may wish to worship or to learn about the Gospel of Jesus Christ.

27.     It is LOTW's sincere belief that God has called the Church to construct a new building on Main Street in Walthill to use for worship, to share God's truth with the Village and the surrounding area, and to minister to the Village and the surrounding area.

## WALTHILL AND THE VILLAGE BOARD

28.     Walthill has had economic difficulties over the past several decades.

29.     A number of properties and buildings in Walthill, including along Main Street, are vacant and in a state of disrepair.

30.     There are only a few businesses that actually operate in the downtown areas of Walthill.

31.     Walthill's population has declined from 909, according to the 1990 Census, to 780, according to the 2010 Census.

32.     Walthill is governed by a Village Board of Trustees (the "**Village Board**" or the "**Board**") made up of five (5) Trustees.  Information regarding the Village Board is available on the Village's website: http://www.walthillne.com/.

33.     The Village Board consists of five (5) members, designated as Trustees.  One Trustee is designated as Chairperson.  The term of office for each member is four (4) years.  Trustees are required to live in Walthill to serve on the Board.

34.     Regular Village Board meetings are held on the first Wednesday of each month at 5:30 p.m. in a meeting room at the Walthill Village Office.

35.     Pursuant to the Nebraska Open Meetings Act, the Village Board is required to keep minutes of its meetings showing at least the time, place, members present and absent, and the substance of all matters discussed.

36.     A Village employee takes notes at Village Board meetings to create minutes.

37.     At its regular meetings, the Village Board reviews and approves the minutes of its previous meeting.  When the Board reviews the minutes of a meeting, the Board has an opportunity to make truthful corrections to the Board minutes.

### LOTW ATTEMPTS TO BUILD IN 2014—THE VILLAGE BOARD RESPONDS UNLAWFULLY PASSING ORDINANCES TO IMPEDE THE EFFORT

38.     Beginning in 2013, LOTW purchased several properties on the 200-block of Main Street in Walthill, across the street from LOTW's Current Building.

39.     The Village was aware of the Church's purchases of these properties.

40.     On May 15, 2013, a meeting was held and attended by then-Village Board Chairperson H. Dean Ross, another Trustee, the Village Clerk, representatives of Washington

County Bank, and LOTW to attempt to work out issues related to a lien or liens on the 209 and 211 Main Street properties that LOTW sought to purchase.

41.     At this meeting, Chairperson Ross raised concerns regarding a compromise proposed by Washington County Bank.  Ross stated that he had spoken with Trustee Mike Grant and that they did not want the Village to take anything less than the full amount of its lien.

42.     At this meeting, Chairperson Ross stated concerns regarding LOTW's proposed purchase because "We are trying to get . . . businesses on Main Street who pay taxes" and the "Church would not be paying taxes."

43.     Minutes of the Village Board meeting dated July 1, 2013, discuss LOTW's desire to purchase properties at 209 and 211 Main Street "to build a church complex . . . ."  The minutes also memorialize the Village Board's vote at the meeting to accept a payment in exchange for releasing the Village's lien on 209 and 211 Main Street.

44.     The Board did not cite any concerns regarding LOTW's desire to build a new church worship facility at the July 1 meeting, nor did the Board make any findings regarding any concerns, problems, or possible detrimental effects of LOTW's construction of a new church building.

45.     The properties along the north side of the 200 block of Main Street that LOTW ultimately purchased included PID Nos: 003340006, 003340007, 003340008, 003340010, and 003340011 (these properties, collectively, the "**Main Street Properties**").  These properties are shown on Exhibit A.

46.     LOTW sincerely believes God gave the Church the Main Street Properties to construct a new facility for religious worship and ministry.  These properties are particularly well-suited to meet LOTW's needs and desires for a new Church building.

47.     In December 2013, LOTW submitted a building permit application requesting approval to build a "church building – steel frame" on three of the Main Street Properties (the "**Building Permit**").

48.     The Village Board considered whether to grant LOTW's requested Building Permit at the Board's January 14, 2014, meeting.

49.     LOTW's request for a Building Permit was the only request or application related to a specific building, construction, or development project that was considered by the Board at the January 14 Village Board meeting.

50.     Just after the meeting was called to order, Trustee Grant made a motion and the Board voted to go into a closed executive session that lasted for over 50 minutes.  The minutes of the January 14 meeting state:

> Chair Ross called the meeting to order at 5:21 p.m.
> The availability of the open meeting laws was brought to the public's attention.
> A motion was made by Grant, seconded by Porter to go into Executive Session at 5:22 pm to discuss strategies of community development in which other political subdivisions may be in competition.  All trustees in attendance voted aye.  Motion carried.

51.     On January 14, 2014, a closed session of the Village Board was not clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of any individual, nor did the Board require a closed executive session of the Village Board for a strategy session with respect to collective bargaining, real estate purchases, pending litigation, or litigation.  On January 14, 2014, the Village was not involved in or threatened with litigation related to community development or any similar matter.

52.     After the Village Board's closed executive session at the January 14 meeting and immediately before the Village Board considered LOTW's application for the Building Permit, Trustee Grant proposed a new Village ordinance related to building permits, Ordinance #2014-1

(the "**Permit Ordinance**").  The three members of the Village Board present approved the proposed ordinance.

53.     The Permit Ordinance imposed a number of requirements on applicants for a building or demolition permit, including penalties for violations, providing a right of entry for a building inspector, and requiring posting of cash or a bond for demolition of a building.

54.     Immediately after approving the Permit Ordinance at the January 14 meeting, the Village Board considered whether to approve the Building Permit requested by LOTW in its December application.  The Village Board approved a Building Permit for LOTW but required that the Church provide for two commercial businesses on Main Street in its construction plans.

55.     According to the minutes of the January 14 Board meeting, Trustee Grant stated, "I am not saying you cannot have a church in town.  You can save souls in a church that is sitting in Centennial [Street] and in a residential area, okay?  Now, the residential area, where the souls are, are living closer to the church."

56.     According to the minutes of the January 14 Board meeting, Trustee Grant stated, "I have a vision for Main Street.  I am going to be honest with you guys. I believe churches should be in residential areas."

57.     At the January 14 Village Board meeting, Trustee Grant made the following statements:

        A.      "We are in talks with the Omaha Tribe about developing Walthill.  They want to use Walthill as their industrial area."

        B.      "One of the letters [submitted in support of the Church's request] talks about . . . a positive change can happen with our church, like there's been nothing

9

happening or changing that's been happening . . . When I hear all this stuff, it's almost like [the Church is suggesting] there's no positive change happening" in the town.

  C. "I'm glad you're here, I'm so happy that you're here, I'm glad that you got your Bible . . . but let's be realistic now . . . we're talking about people coming in to develop business. . . We have to make sure we have money coming into this town."

  D. When Trustee Grant stated "let's be realistic now," he appeared to chuckle or laugh.

58. After the January 14 Village Board meeting, the Village added the following to the minutes of the meeting in regard to the Board's discussion of whether to approve the Building Permit, the "discussion resulted in Pastor Paul Malcomson and Trustee Grant shaking hands to agree to allow Trustee Grant to be in the planning process of [the Church's] design" for its new building.

59. No such handshake or agreement had occurred at the January 14 meeting.  LOTW would not have agreed, and did not agree, to allow a member of the Board, a government official, to be a part of the Church's planning or design process.

60. The Village Board adopted the inaccurate amendment to the minutes of the January 14 Village Board meeting at the Village Board's March 10, 2014, Village Board meeting.

61. Trustee Grant later purchased and currently owns the property at 209 Main Street, PID No. 003340004 as of the date of this Complaint.  The 209 Main Street property is immediately adjacent to LOTW's Main Street Properties.

62.     Trustee Grant later purchased and currently owns the property at 318 Main Street, PID No. 003370008 as of the date of this Complaint.  The 318 Main Street property is located in the C-1 commercial zone.

63.     In January and July 2014, three out of five members of the Board, including Trustee Grant were members of the Omaha Tribe of Nebraska.

## WALTHILL'S APRIL 2014 ZONING ORDINANCE AND COMPREHENSIVE PLAN

64.     On April 14, 2014, the Board considered and adopted a zoning ordinance for the Village codified as the "Zoning Ordinance of the Village of Walthill, Nebraska" in the Walthill, Neb. Code (the "**Zoning Ordinance**"), a zoning map (the "**Zoning Map**"), and a comprehensive development plan (the "**Comp. Plan**") through Ordinance 2014-5.  These actions are memorialized in the minutes of the April 14, 2014, Board meeting.

65.     The Village's Zoning Ordinance allows religious assembly uses—referred to as "churches and other religious institutions"—only as a "special use" with a "special permit." Zoning Ordinance §§ 501.04, 502.04, 503.04, 505.04, 506.04.

66.     The Zoning Ordinance does not allow religious assembly uses as a permitted or conditional use without a special permit in any zoning district or area of the Village.

67.     The Zoning Ordinance provides that "[n]o building, structure, or land shall hereafter be used or occupied, and no building or structure or part thereof shall hereafter be erected, constructed, reconstructed, moved or structurally altered except in conformity with all of the zoning regulations herein specified [in the Zoning Ordinance] for the district in which it is located."  Zoning Ordinance § 202.

68.     The Zoning Ordinance provides that "special uses are allowed only by a special permit granted by the Village."  Zoning Ordinance § 202.

11

69.     The Zoning Ordinance defines a special permit/special use permit as:

A written permit issued with authorization of the Village Board. The special permit provides permission under specific conditions to make certain special uses of land in certain zoning districts as stipulated under permitted special uses in each of the district zoning regulations.

Zoning Ordinance § 303.

70.     The Zoning Ordinance provides that:

[N]o special use permit shall be granted by the Village Board, without an affirmative vote of a majority of all members of the Village Board and unless the proposed use is found to:

1.  Be compatible with and similar to the use permitted in the district, and
2.  Not be a matter which should require rezoning of the property, and
3.  Not be detrimental to adjacent property, and
4.  Not tend to depreciate the value of the surrounding structures or property, and
5.  Be compatible with the stated intended use of the district, and
6.  Not change the character of the district, and
7.  Be in accordance with the Comprehensive Plan.

Zoning Ordinance § 702.03.

71.     Neither the Zoning Ordinance's text nor any other section of the Walthill, Neb. Code describes or defines the meaning of the phrases set forth in paragraphs 1-7 of Zoning Ordinance Section 702.03.

72.     Neither the Zoning Ordinance's text nor any other section of the Walthill, Neb. Code describes or dictates how the Village could, will, or must determine the issues set forth in paragraphs 1-7 of Zoning Ordinance Section 702.03.

73.     The Zoning Ordinance states that:

In case of protest against [a requested] special use permit, signed by owners of twenty percent (20%) or more either of the area of the lots included in such proposed change, or of those immediately adjacent on the sides and in the rear thereof extending three hundred (300) feet, therefrom, and of those directly opposite thereto extending three hundred (300) feet from the street frontage of such opposite lots, such special use permit shall not become effective except by the favorable vote of three-fourths of all the members of the Village Board.

Zoning Ordinance § 702.04.

74.     Zoning Ordinance Section 702.04 does not address or require disclosure of the motivation for a protest by the adjacent property owners referenced therein.

75.     Zoning Ordinance Section 702.04 would allow the adjacent property owners referenced therein to protest a requested special use for any reason, including on the basis of religion or race, or because of the viewpoints, beliefs, or previous public expression of the property owner or applicant.

76.     The Zoning Ordinance is a land use regulation or system of land use regulations under which Walthill makes, or has in place, formal or informal procedures or practices that permit it to make individualized assessments of the proposed uses for and development of properties in the Village.

77.     In certain zoning districts, the Zoning Ordinance classifies religious assembly uses as "public and quasi-public uses of an educational, recreational or religious type …" Zoning Ordinance §§ 502.04.1, 503.04.1, 504.04.4.

78.     The Zoning Ordinance allows the following uses as a permitted use in the C-1 zoning district:

1.  Business and professional offices;
2.  Retail stores and service establishments which supply commodities or provide services primarily to meet the needs of residents of the trade area conducted entirely within an enclosed building;
3.  Automobile service stations;
4.  Dwelling units above the first story of a building.

Zoning Ordinance § 504.02.

79.     The Zoning Ordinance allows the following uses in the C-1 zoning district, among others, only "if a special permit for such use has been obtained in accordance with Article 7 of" the Zoning Ordinance:

1.  Multi-family structures.

2. Wholesaling activities.
3. Car/truck wash.
4. Public and quasi-public uses of an educational, recreational or religious type including nursery schools, churches, parsonages, and other religious institutions.
5. Public and private charitable institutions.
6. Public uses of an administrative, public service or cultural type including city, county, state or federal administrative centers and courts, libraries, police and fire stations and other public buildings, structures and facilities.

Zoning Ordinance § 504.04.

80.     The Zoning Ordinance allows the following uses as a permitted use in the C-2

zoning district:

1. Establishments which provide services or supply commodities at retail primarily for the convenience of patrons traveling on highways and roads; and
2. Other local commercial establishments providing services and supplies to the community and local trade area, including but not limited to automotive dealerships and agricultural implement dealerships.

Zoning Ordinance § 505.02.

81.     The Zoning Ordinance allows the following uses in the C-2 zoning district,

among others, only "if a special permit for such use has been obtained in accordance with Article

7 of" the Zoning Ordinance:

1. Churches and other religious institutions;
2. Private clubs and lodges;
3. Public buildings and grounds;
4. Hospital, nursing home, and other medical facilities;
5. Public and private charitable institutions;

Zoning Ordinance § 505.04.

82.     The Zoning Ordinance allows the following uses in the "Industrial" zoning

district, among others, only "if a special permit for such use has been obtained in accordance

with Article 7 of" the Zoning Ordinance:

1. Churches and other religious institutions;
2. Private clubs and lodges;
3. Public buildings and grounds;
4. Public and private charitable institutions;
5. Other public and quasi-public uses; . . .and

* * *

10. A use which is consistent with the intent of this district and which is not specifically prohibited for this district.

Zoning Ordinance § 506.04.

83.     The Zoning Ordinance provides "design standards for all structures" only for structures in the C-1 zoning district. Zoning Ordinance § 504.08.

84.     Among other provisions, the C-1 zoning district's design standards, set forth in Zoning Ordinance Section 504.08, state that:

1. **Building Sizes and Projections**
   A. Building height should be comparable to adjacent structures…
   B. A distinct cornice along the top of the façade of the building should be defined by using at least one of the following elements:
      1. A horizontal projection or series of projections from the surface of the facade of the building.
      2. A contrasting change in pattern, texture or color from that of the wall surface.
   C. A storefront cornice comparable to adjacent structures, or structures within the Downtown should be established and the size and proportions of window and door openings within the storefront and throughout the building should be similar to those on buildings in the Downtown.

2. **Facade Elements:** Materials used for building facades should be similar to those used on adjacent buildings.
   1. Primary materials are materials used historically in the Downtown and are required to be used similarly in new construction as follows:
      A. Brick – varying colors, sizes and textures of brick exhibited in existing buildings.
      B. Wood — best utilized for architectural elements such as pilasters, cornices or decorative raised panels and trim. The use of wood as a general siding material is discouraged due to maintenance requirements.
      C. Concrete block — is best utilized in combination with other materials such as brick or stone.  The use of concrete block as the only building material is strongly discouraged.
      D. Metal flashing and Architectural elements — Metal, painted or exposed, forms long lasting flashing and other architectural elements such as cornices and moldings.
      E. Structural steel — Exposed structural pre-formed steel fulfills aesthetic purposes at lintels and columns in a manner similar to existing historic structures.

3. **Other Materials:** The following materials do not coincide with the historic elements of Downtown Walthill.

1. Stucco – materials similar in texture and perception are recommended only as an accent element to a facade. Although a couple of buildings are stucco covered today, it was not the historically accurate facade exterior.
2. Metal, aluminum or vinyl siding or preformed panels—are not to be utilized and should only be utilized as accents or within small areas of a façade.
3. Asphalt shingles or siding — should only be utilized in limited instances, potentially as an awning or cornice element.

Zoning Ordinance § 504.10.

85.    Walthill did not conduct any study focused on, or specifically related to, assembly uses, religious assembly land uses or church land uses before or at the time that the Village Board approved April 2014 Zoning Ordinance or Comprehensive Plan.

86.    Walthill did not review or rely on any study focused on, or specifically related to, assembly uses, religious assembly land uses or church land uses before or at the time that the Village Board approved the Zoning Ordinance or Comprehensive Plan.

87.    Walthill has never conducted any study focused on, or specifically related to, assembly uses, religious assembly land uses or church land uses.

88.    After the Village approved the Zoning Ordinance, in May 2014 the Village's contract planner sent a copy of the Zoning Ordinance adopted in April 2014 to LOTW.

89.    A number of non-profit, government, and secular assembly uses are located on property in Walthill's C-1 and C-2 "commercial" zoning districts, including:

A.    The Walthill public library, 323 Main Street (since March or April 2017 and formerly located at 222 Main Street);

B.    The Walthill Fire Hall, 123 Main Street (since January 2015 and formerly located at 323 Main Street). The Village uses the Walthill Fire Hall for meetings and rents out the hall for gatherings and events;

C.    Olive Branch (Masonic) Lodge #274 located at 401 Main Street;

D.    Lucky 77 Casino, 202 Main Street;

16

      E.      Walthill Senior Center, 101 North Hayden Street;

      F.      The Post Office, 316 Main Street;

      G.      Village Offices, including the meeting room at which Village Board

meetings are held, 224 Main Street; and

      H.      Omaha Tribe Police Substation, 305 Main Street.

90.      Walthill's April 2014 Comprehensive Plan stated that one of its policies was to "[i]mprove and beautify the built environment in Walthill" which included an action strategy to "[r]emove or repair dilapidated and unsightly buildings."

91.      Walthill's April 2014 Comprehensive Plan stated that:

The analysis of the existing land use in Walthill revealed a deficiency of parks and recreational facilities, public/quasi-public facilities, multifamily residential, commercial and industrial land use types, which are common to small Towns.

92.      Walthill's April 2014 Comprehensive Plan included the following definition which included the plan's only reference to churches or religious assembly land uses in the plan:

**Public/Quasi-Public** land acreage in Walthill totals an estimated nine acres, or 4.4 percent of the total platted Village area.  This land classification includes the Walthill Senior Center, Churches, Walthill Public Schools, the Village Offices and various public buildings.  This land use classification equals an estimated 1.1 acres per 100 people, about 61 percent less than the recommended Planning Standard.  Approximately 1.2 acres of Public/Quasi-Public uses are located along Main Street in Downtown Walthill.

93.      One of the "Planning Implementation Recommendations" in Walthill's April 2014 Comprehensive Plan was to "[e]ncourage removal and replacement of substantially dilapidated and substandard structures within the Community."

## THE BOARD'S RETALIATORY REVOCATION OF LOTW'S BUILDING PERMIT AND TWO-YEAR REFUSAL TO ACT ON ITS REQUEST FOR A DEMOLITION PERMIT

94.      In May 2014, LOTWs applied for a demolition permit to destroy certain unsafe and dilapidated buildings on LOTW's Main Street Properties.

95.     The buildings that LOTW sought, and seeks, to demolish through the requested demolition permit have numerous problems, including large holes in their roofs.  Pictures of the interior and exterior of these buildings are attached hereto as Exhibit D.

96.     On June 2, 2014, the Village Board considered issuing LOTW's requested demolition permit at a meeting.  The Board did not issue the demolition permit and tabled discussion regarding of approval of the permit until the Board's July meeting citing concerns regarding an upcoming "rodeo weekend" parade.

97.     As acknowledged by the Board at this meeting, the Village Board could have approved the Demolition Permit conditioned on demolition work commencing after the parade.

98.     At this meeting, Board Chairperson Ross also, for the first time, raised concerns regarding debris on the Main Street Properties.  No discussion regarding such debris had occurred at the June 2 meeting or at any other open meeting of the Board.

99.     Other properties in the Village had debris and/or were in a state of disrepair worse than any of the Main Street Properties and did not have plans submitted to the Village to demolish problematic structures and improve their properties.  Pictures of other properties in the Village that were taken on June 3, 2014, are attached hereto as Exhibit E.

100.    After raising concerns regarding alleged debris, Chairperson Ross, on behalf of the entire "Board" then "gave a verbal directive for Light of the World Gospel Ministries to remedy within 10 days the safety issues regarding their open demolition permit or the village would perform the [clean up] work and bill them."

101.    Specifically, Chairperson Ross stated "as a Board we would like to give [the Church] ten days to get" the items cleaned up.  Because the Board had not discussed this issue

previously at its open meeting, the Board had discussed this purported directive outside of the open meeting.

102.     At the meeting, Chairperson Ross threatened on behalf of the Board to charge LOTW if items were not cleaned up "and that will be added as a lien against the property."

103.     Multiple sites in the Village had debris far worse than any on LOTW's Main Street Properties and did not have a clean-up and demolition plan submitted to the Village Board for approval.  Yet these other properties had not been issued clean-up orders by the Board.

104.     LOTW cleaned up and removed the minimal debris referenced by Chairperson Ross promptly after it first learned of the Board's concerns at the June 2 meeting.  The Church had intended to complete this clean-up work as a natural part of its proposed demolition project pursuant to its requested demolition permit that the Village refused to grant.

105.     On or about June 25, 2014, an attorney representing LOTW sent a letter to the Village Chairperson and Board raising concerns regarding the Village's refusal to grant the requested demolition permit and discussing several provisions of RLUIPA, including its substantial burden, equal terms, nondiscrimination, and unlawful exclusion provisions.  The attorney's letter discussed federal law at length.  The only issue of Nebraska law in the letter was a single sentence in which the letter referenced the Church's rights under RLUIPA, the U.S. Constitution, and "the Constitution of the State of Nebraska."  The letter discussed RLUIPA and federal law for three more pages, and did not otherwise reference any Nebraska statute, law, or rule.

106.     The Village Board's Chairperson in 2013 and 2014, Chairperson Ross, had been the pastor of the Assembly of God Church in Walthill when LOTW was first planted. Chairperson Ross' church had extremely low attendance. By 2014, Chairperson Ross was

19

holding services at the Presbyterian Church in Walthill that were attended by a handful of congregants.

107.    Upon information and belief, in or about 2014, Chairperson Ross was disciplined by the Assembly of God denomination for his actions and animosity toward LOTW.

108.    In 2013 and later, Chairperson Ross was motivated by personal animosity toward LOTW that influenced his and the Board's decision-making and actions.

109.    On or about June 30, 2014, Chairperson Ross moved his residence out of Walthill, making him ineligible to remain a member of the Village Board. Chairperson Ross remained a member of the Board despite his move.

110.    On July 2, 2014, Chairperson Ross sent an email message to the Village Clerk regarding the agenda for the Village Board's July 8, 2014, meeting.  The message stated:

> Immediately after the agenda items for the out of town people, please add the following items:
>
> 1) Executive Session to discuss possible litigation against the Village and to confer with our attorney.
>
> 2) Discussion of revocation of building permit number 01142014 approved on 1/14/2014 for LOTW Gospel Ministries-Discussion-Board action

111.    There was no lawful reason for the Village to consider LOTW's Building Permit at its July 8, 2014, meeting.

112.    Before Chairperson Ross's July 2, 2014, email message, the Board had not been scheduled to consider revocation of LOTW's Building Permit.

113.    Chairperson Ross scheduled the revocation of LOTW's Building Permit on July 2, 2014, in retaliation for LOTW's attorney's June 25, 2014, letter.

114.    The same day as Chairperson Ross scheduled the revocation of LOTW's Building Permit to the Board's upcoming meeting agenda, July 2, 2014, Village Attorney Matthew

Munderloh sent a letter on behalf of the Village to the Nebraska Counsel for Discipline, copying the attorney discipline offices of Kentucky and Texas.

115.    Village Attorney Munderloh's letter alleged that LOTW's attorney was engaged in the unauthorized practice of law in Nebraska.  The letter was intended to harass LOTW, to gain leverage in the Village's dealings with the Church, and/or to diminish the possibility of litigation from LOTW.

116.    Village Attorney Munderloh's letter was sent in retaliation for the Church's attorney's June 25, 2014, letter.

117.    The same day as Chairperson Ross scheduled the revocation of LOTW's Building Permit to the Board's upcoming meeting agenda, July 2, 2014, Village Attorney Matthew Munderloh sent a letter on behalf of the Village to LOTW's pastor informing him that the Village Board had placed the revocation of the Church's building permit on the agenda of the July 8, Board meeting.

118.    On July 3, 2014, the Village Clerk sent a revised agenda to members of the Village Board. Chairperson Ross responded to this message with a suggested change to the wording of the new agenda items he had inserted on July 2. His message stated, "The wording on these two items is very important, please adjust the agenda accordingly."

119.    The Village Board considered LOTW's request for a demolition permit for the second time at the Board's July 8, 2014, meeting.  At this meeting, Village Attorney Munderloh stated that LOTW's request for a demolition permit complied with the Village's ordinances and he recommended that the Board approve LOTW's request.

120.    At the July 8 meeting, Rod Schultz, the owner of a property at 217 Main Street (the "**217 Main Property**") adjacent to a building that LOTW intended to demolish asked the

Board to provide assurances that no damage would occur to his building as a result of LOTW's proposed demolition.

121.    At the July 8 meeting, Chairperson Ross stated that the Board was unable to give assurances to the owner of 217 Main Property and that any damage to his building would be a private matter between the two parties.  LOTW responded by stating that it had sufficient insurance coverage and there was no common wall between the two buildings.

122.    At the July 8 meeting, Chairperson Ross stated that it would not be appropriate for the Board to delay approval of the demolition permit until Mr. Schultz's concerns were resolved.

123.    The Board voted on July 8, 2014, to table consideration of LOTW's requested demolition permit until the following month.

124.    After leaving the July 8 meeting and going outside to her car, a member of LOTW found the tires of her car had been slashed.

125.    The July 8 Board meeting was continued until July 15, 2014.  On July 15, the Board moved forward with Chairperson Ross's proposal to revoke LOTW's January 2014 Building Permit.

126.    At the Board meeting on July 15, 2014, Trustee Grant asked that anyone who did not live in Walthill or on the Omaha Indian Reservation to leave the meeting.

127.    Trustee Grant selected five specific individuals in attendance and instructed them to leave the meeting.  All five individuals attended LOTW and had come to the meeting to support the Church.

128.    Trustee Grant intentionally selected these five individuals because of their affiliation with the Church.

129.     One of the five selected for dismissal by Grant was a resident of Walthill and another was in the process of building a house in Walthill.  All five individuals had a right to attend the meeting in support of their Church.

130.     Four attendees at the meeting whose names are noted in the meeting minutes alleged that members of LOTW had proselytized in ways they believed to be offensive or that members of LOTW held unfavorable religious views of Native Americans or Native American religious beliefs.  None of these visitors shared any concerns regarding LOTW's building, demolition, or other issues on which the Board might have legitimately acted.

131.     One of the four speakers asked the Village Board if the Board could ban LOTW from the Omaha Reservation.  Chairperson Grant suggested a way that the Omaha Tribe may be able to ban the Church or its members from Tribal land.

132.     A member of LOTW attempted to respond to one of the four speakers who raised issues regarding LOTW allegedly sharing its faith.   The woman responded "Stop interrupting white boy."

133.     The four speakers who spoke against LOTW's religious activities and the Board's action that resulted from these comments are memorialized in the Village Board's meeting minutes for the July 15, 2014, meeting which state:

> Visitors speaking included Sherry Moniz-Dewey, Thomas Parker, Mitchell Parker and Lisa Drum with concerns regarding LOTW Gospel Ministries.
>
> As a result of the testimony given by visitors, Trustee Grant made a motion to revoke building permit #01142014 to LOTW Gospel Ministries. Voting aye: Ross, Grant and Porter. Nay:  King. Absent: Appleton. Motion carried.

134.     Upon information and belief, before their testimony on July 15, Chairperson Ross and/or Trustee Grant had private discussions with the four individuals who spoke at the July 15 meeting.

135.    LOTW was not allowed to speak in opposition to the revocation of its Building Permit or its need for a new Church building.

136.    The Village Board did not cite any lawful concern, interest, or evidence to justify its revocation of the Building Permit.

137.    The only reason cited by the Board for its revocation of LOTW's Building Permit was the opinions of visitors at the July 15 meeting criticizing alleged religious conduct and religious views of LOTW.

138.    The testimony of the visitors who were allowed to testify at the July 15 Board meeting was false and racially biased.

139.    As recorded in the minutes of its July 15 Board meeting, the Village effectively adopted these same views as its own and revoked LOTW's building permit solely because of these views.

140.    At the next Village Board meeting on August 12, 2014, the Board reviewed and approved the minutes of its previous meeting held on July 8 and 15, 2014. No member of the Board corrected, added to, or amended the minutes before the Board's approval.

141.    On August 12, 2014, however, the Board did not actually review complete and accurate minutes of the meeting held on July 8 and 15, 2014.  On July 31, 2014, the Village Clerk sent an email to the entire Village Board and Village Attorney Munderloh, stating;

>    Attached are the revised [draft minutes of the July 8 and 15, 2014, Board meeting].  After a discussion with [Village Attorney] Matt [Munderloh], I took out the portion regarding making some people leave the meeting.  I don't believe there are any other changes.  Please let me know if I am able to forward to the newspaper.

142.    At the Board's August 12 meeting Chairperson Ross stated that he had spoken earlier in the day to Mr. Schultz, the owner of the 217 Main Property.  According to Chairperson

Ross, Schultz had not seen proof of LOTW's insurance.  As a result, the Board voted to deny LOTW's requested demolition permit.

143.   Neither Chairperson Ross nor any other member of the Board asked LOTW regarding any discussions with Mr. Schultz or LOTW's proof of insurance either before or at the meeting.

144.   At the August 12 Village Board meeting, the Board approved a building or renovation permit for Coalition for a Better Community—a non-profit organization—for a building at 318 Main Street, a property zoned C-1.  The Board did not cite or raise any concern regarding commercial activity or the need for business uses in the C-1 district in relation to its consideration of this application

145.   In August 2014, LOTW again applied for a demolition permit seeking to demolish the same structures sought to be demolished through LOTW's May 2014 request.

146.   On September 16, 2014, the Board denied LOTW's requested demolition permit, as memorialized in meeting minutes:

> Discussion was held regarding a demolition permit submitted by LOTW Gospel Ministries with Trustee Grant citing a partnership with the Omaha Tribe for economic development within the village and community member concerns regarding LOTW and adjacent property owner, Rod Schultz commenting on needing  assurances regarding damage to his property as a result of the demolition, therefore, Trustee Grant made a motion, seconded by Porter to deny the demolition permit submitted by LOTW Gospel Ministries, All trustees in attendance voted aye.  Motion carried,

147.   On November 10, 2014, the Village Board approved a demolition permit for the Assembly of God Church, Village Chairperson Ross's former church.

148.   On or about January 30, 2015, the Omaha Tribe of Nebraska purchased the 217 Main Property.

25

149.    On February 5, 2015, Village Chairperson Ross finally resigned from the Board, despite having moved out of Walthill in June 2014.

150.    In February 2015, LOTW again applied for a demolition permit.

151.    At its March 2, 2015, meeting, the Board tabled LOTW's permit application "so they can notify the Omaha Tribe, who recently acquired" the 217 Main Property.  At this meeting, the Village Building inspector had reported to the Board that the building that LOTW intended to demolish and the building on the 217 Main Property are separate structures and do not share a common wall.

152.    In March 2015, LOTW sent a letter to the Omaha Tribe attempting to address any concerns regarding LOTW's demolition plans.  LOTW did not receive a response from the Tribe.

153.    At its April 1, 2015, meeting, the Board first found that "[d]ue to lack of a motion and the willingness to meet with the Omaha Tribe, the demolition permit submitted by LOTW failed."  Later in the meeting, then-Chairperson Mike Grant instructed the Village Clerk to place the requested demolition permit on the agenda for the Board's May meeting.  Despite this instruction, the Village denied the requested demolition permit without further action of the Board.

154.    LOTW took numerous good-faith actions attempting to meet and communicate with the Omaha Tribe in April, May, June, July, August, and September 2015.  However, the Tribe did not meet or communicate with LOTW.

155.    In June, July, and August 2015, the Village Board refused to act on LOTW's requested demolition permit without the specific approval or consent from the Omaha Tribe or its Tribal Council.

156.    Upon information and belief, the Village has not required a building or demolition permit for projects in the Village.

## THE VILLAGE'S UNEQUAL TREATMENT OF SECULAR ASSEMBLY USES AND REFUSAL TO GRANT LOTW'S REQUEST FOR A SPECIAL USE PERMIT

157.    In 2013, the Village began working on a plan to relocate and expand the Walthill public library to Walthill's former fire station.

158.    In 2016, the Village finalized plans for the library relocation and expansion project.  The plans included relocating the library to the Village's former fire station and significantly expanding the library's meeting space.

159.    A photograph of the former fire hall to which the library relocated is shown before the library was moved there on the first page of Exhibit F which is attached hereto.

160.    The Village's library expansion and renovation project was completed in or around March or April 2017.  The new library is much larger than the Village's former one-room library.

161.    The library is located at 323 Main Street in Walthill, a property located in the C-1 commercial district.

162.    The C-1 district allows "Public and quasi-public uses of an educational, recreational or religious type including nursery schools, churches, parsonages, and other religious institutions" and "Public uses of an administrative, public service or cultural type including city, county, state or federal administrative centers and courts, libraries, police and fire stations and other public buildings, structures and facilities" only with a special use permit.

163.    The Village has never approved or issued a special use permit for its library.

164.    According to the Zoning Ordinance, "[n]o building, structure, or land shall hereafter be used or occupied, and no building or structure or part thereof shall hereafter be

erected, constructed, reconstructed, moved or structurally altered except in conformity with all of the zoning regulations" specified in the Zoning Ordinance for the district in which it is located. Zoning Ordinance § 202

165.    The C-1 zoning district's design standards, set forth in Zoning Ordinance Section 504.08, apply to "all structures" in the district.  Among other requirements, the design standards prohibit building facades of "Metal, aluminum or vinyl siding or preformed panels—[which] should only be utilized as accents or within small areas of a facade."

166.    Despite the relocation, expansion, alteration, and construction of the new library, the Village did not require it to comply with the "design standards" of the Zoning District.

167.    As late as April 2017, the Village was uncertain whether LOTW would be required to request a Special Use Permit to use the Church's Main Street Properties for religious worship.

168.    In 2017 there was a meeting or meetings regarding a "community center partnership" that included a member of the Village Planning Commission, a representative of the Walthill Senior Center, a representative of the Masonic Lodge in Walthill, and the Village's development person.  LOTW was not invited to this meeting or meetings.

169.    Notes from a community center partnership meeting indicated that participants discussed, among other topics:

      A.    Possible location of a community center;

      B.    Whether LOTW would accept or build on a new location rather than the Main Street Properties; and

      C.    Potentially classifying the Senior Center as a business by selling food.

170.    In June 2017, for the first time the Village informed LOTW that it was required to request a Special Use Permit to use the Church's Main Street Properties for religious worship.

171.    On or about June 7, 2017, LOTW submitted an application for a Special Use Permit to the Village, requesting that the Church be permitted to use the Main Street Properties as a "church" for an indefinite period of time.

172.    On July 10, 2017, the Village's Planning Commission held a public hearing regarding LOTW's application for a Special Use Permit.

173.    At this meeting, a representative of the Native American Church expressed opinions regarding LOTW's alleged religious views.

174.    No speaker at the July 10, 2017, Village Planning Commission meeting raised any concern regarding LOTW that the Village could lawfully consider.

175.    The Minutes of the July 20, 10 meeting state that

> The opportunity to speak on reasons for both pro and con was given and several village residents and community members took the floor.
>
> Motion to hold an executive session, MSC. At 8:00 pm, Chairman Roger Tremayne called an executive session and the public was asked to leave the room. Commission members present discussed the issues presented as they pertain to the zoning regulations in place.  A motion to come out of executive session at 8:35 pm, MSC.
>
> Recommendation: The commission recommends to the Village Board that the special use permit be denied.  The special use permit requested runs counter to the long-range comprehensive plans and the intended purposes of the Walthill zoning regulations in the uses of C-1 properties.  The decision to deny the request was read to the public.

176.    On July 10, 2017, LOTW had not brought or threatened litigation, nor had any other party on behalf of LOTW.

177.    On July 10, 2017, a closed session of the Village Planning Commission was not clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of any individual.

29

178.    On July 10, 2017, the Village Planning Commission did not require a closed executive session of the Village Board for a strategy session with respect to collective bargaining, real estate purchases, pending litigation, or litigation.

179.    On September 13, 2017, the Village Board held a public hearing to consider whether to approve the Special Use Permit requested by LOTW.  No member of the Board made any comment regarding LOTW's proposed use during the public hearing other than to summarize the Planning Commission's July 10, 2017, recommendation.  The Planning Commission recommendation did not cite or reference any evidence, study, or finding on which its recommendation was based.

180.    LOTW Pastor Malcomson was the only person who spoke during the public hearing regarding LOTW's permit.

181.    Among other comments, Pastor Malcomson informed the Board that:

It is our sincere belief that God has directed us to have a church building within the Village of Walthill, to use for Worship, to share God's truth with the Village, and to Minister to the Village. . . In order to live out our beliefs we need to build a place of worship and ministry on these lots. . . We have outgrown our current building and have no room to continue our worship and ministry there.

182.    Pastor Malcomson did not threaten litigation in his comments.  LOTW had not threatened or brought a lawsuit against the Village on or before September 13, 2017.

183.    Immediately after Pastor Malcomson finished his comments and before the Board took any action on LOTW's SUP Application, the Village Board closed the meeting and went into a closed executive session.  The Board did not state any reason or purpose for closing the meeting and closed the meeting in the middle of the public hearing regarding LOTW's application for a Special Use Permit.

184.    Immediately after the Board re-opened the meeting, Chairperson Grant stated that the Board would take action on LOTW's application for a Special Use Permit.  After Chairperson Grant requested that a Trustee make a motion regarding LOTW's SUP Application, Trustee Aaron Brown made a motion for the Board to approve LOTW's requested SUP.  No member of the Board seconded the motion and the Board considered the SUP to be denied.

185.    No member of the Village Board stated or cited a reason, fact, purpose, finding, evidence, study, potential problem, problem, or any other statement as to the reason for the Board's denial of LOTW's SUP.  The Board did not issue any written document or findings for its non-action.

186.    The minutes of the Board's September 13, 2017, meeting state the following summarizing the public hearing on LOTW's application for a Special Use Permit:

> Pastor Paul Malcomson of LOTW gave a statement regarding the Special Use Permit.
>
> Chair Grant closed the Special Use Permit Hearing at 5:42 p.m.  Trustee Brown made a motion, seconded by Valentino to go into executive session at 5:42p.m. to discuss litigation strategy.  Upon roll call vote, the following voted aye: Grant, Valentino and Brown.  Nay: None.  Absent: Porter and Stabler.  Motion carried.
>
> Trustee Brown made a motion, seconded by Valentino to reconvene the regular board meeting at 7:15 p.m.  Upon roll call vote, the following voted aye: Grant, Valentino and Brown, Nay: None.  Absent: Porter and Stabler.  Motion carried.
>
> A motion was made by Brown to approve the Special Use Permit application for LOTW Gospel Ministries.  Due to the lack of a second, the motion failed, therefore denied.

187.    At the September 13, 2017, meeting no member of the Board stated that the purpose of the Board's executive session held in the middle of the public hearing regarding LOTW's application for a Special Use Permit was "to discuss litigation strategy."  There was no statement regarding the purpose or reason for the Board's executive session in the motion to close the meeting of the Board on September 13, 2017.

188.    On September 13, 2017, LOTW had not brought or threatened litigation against the Village, nor had any other party on behalf of LOTW.

189.    On September 13, 2017, a closed session of the Village Board was not clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of any individual.

190.    On September 13, 2017, the Village Board did not require a closed executive session of the Village Board for a strategy session with respect to collective bargaining, real estate purchases, pending litigation, or litigation.

191.    LOTW's claims set forth below challenge Walthill's land use regulations, including its Zoning Ordinance, both facially and as applied to LOTW and the Church's numerous attempts to improve and use the Main Street Properties, as well as Walthill's actions directly and indirectly in response to LOTW's building permit, numerous applications for demolition permits, and application for a Special Use Permit.

192.    All acts set forth herein of Walthill, its officers, agents, servants, employees, or persons acting at its behest or direction, were done and are continuing to be done under the color and pretense of state law and pursuant to Walthill's policies, practices and/or customs.  Said acts include, without limitation, the enactment, implementation and enforcement of the Zoning Ordinance and the denial or revocation of multiple permits sought by LOTW.

193.    The Village's actions have caused, and will continue to cause, LOTW to suffer undue and actual hardship and irreparable injury.

194.    LOTW has no adequate remedy at law to correct the continuing deprivations of its rights.

195.    As a direct and proximate result of the Village's continuing violations of LOTW's rights, LOTW has in the past and will continue to suffer in the future direct and consequential damages, including but not limited to, the loss of the ability to exercise its constitutional and other rights.

196.    The Village's failure to adopt clear and concise written policies which protect the rights of LOTW caused the unlawful and discriminatory treatment by the Village.

197.    The Village's failure to properly train, direct, control and supervise the actions and conduct of its officers, agents, servants, employees, or persons acting at its behest or direction, which failure amounted to deliberate indifference, resulted in the violation of LOTW's constitutional and other rights.

198.    The Village's deliberate indifference to act to stop or remedy the unlawful actions amounted to endorsement, adoption and ratification of unlawful actions by any individual member of the Village Board, Village employee, or Village agent.

199.    The Village failed to repudiate or discipline, and failed to immediately act to remedy, the unlawful and discriminatory actions and unlawful conduct set out herein.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE RIGHTS TO FREEDOM OF SPEECH AND ASSEMBLY AS GUARANTEED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

200.    LOTW realleges all of the foregoing paragraphs, herein.

201.    The Zoning Ordinance's regulation of religious assemblies is not a lawful time, place, or manner regulation, as it is not narrowly tailored to serve a significant government interest, and does not leave open ample alternative channels for communication.

202.    The Zoning Ordinance requires all religious assemblies, including LOTW to obtain special dispensation from Village officials to use land for assembling for religious purposes, affords Village officials unfettered discretion to decide whether to allow religious speech, and does not contain in that process the procedural safeguards necessary for a speech-related permit scheme, and constitutes a prior restraint on LOTW's speech in violation of the First Amendment to the United States Constitution.

203.    Walthill's discriminatory treatment of religious land uses constitutes content-based and viewpoint-based restriction of speech and of assembly.

204.    Walthill favors commercial speech and assembly over noncommercial speech and assembly.

205.    The Village treats and has treated religious and nonreligious assemblies and uses differently.

206.    Walthill's content and viewpoint-based restrictions are not supported by a rational, let alone compelling government interest and are not narrowly tailored or the least restrictive means to accomplish a compelling or permissible governmental interest.

207.    The Village has engaged in viewpoint discrimination against LOTW by favoring other groups, religious opinions, and religious groups over the Church.

208.    The Village unlawfully discriminated against LOTW by dismissing its members from a public meeting on the basis of these individuals' association with the Church.

209.    LOTW through its attorney's June 25, 2014, letter and numerous statements by Pastor Malcomson and other Church members to the Village Board, engaged in conduct protected by the First Amendment.

210. Walthill by and through the Village Board, Chairperson Ross, Trustee/ Chairperson Grant, and Village Attorney Munderloh, unlawfully retaliated against LOTW and its members and agents.

211. The Village's actions against LOTW were and are due to the Village's or its officials, employees, or agents, disagreement with and disapproval of LOTW's sincerely held religious viewpoint and its beliefs.

212. The Village's actions and its policies, practices and/or customs , on their face and as applied to LOTW, violate and violated the Free Speech and Freedom of Assembly Clauses of the First Amendment to the Constitution of the United States.

213. The Village's actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, unlawfully impose and imposed overbroad restrictions on LOTW's speech, constitute and constituted an unlawful prior restraint on LOTW's speech that grants unbridled discretion to government officials, and unconstitutionally condition and conditioned a government benefit on the relinquishment of a First Amendment right.

214. The Villages actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, unlawfully chill, deter and restrict, and chilled, deterred and restricted, LOTW's protected speech right.

215. As a direct result of Walthill's violation of LOTW's First Amendment rights to the freedom of speech and assembly, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law. LOTW is therefore entitled to injunctive relief.

216. As a direct result of Walthill's violation of LOTW's First Amendment rights to the freedom of speech and assembly, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

**COUNT II**
**VIOLATION OF THE FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE**
**FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

217.    LOTW realleges all of the foregoing paragraphs, herein.

218.    The Village's actions violate and violated the Free Exercise and Establishment Clauses of the First Amendment to the Constitution of the United States.

219.    The terms and operation of the Zoning Ordinance substantially burden the exercise of religion, and are not neutral or of general application.

220.    Walthill unlawfully enacted its building permit ordinance, enacted its Zoning Ordinance, and/or took other official actions for the purpose of discriminating against LOTW on the basis of religion.

221.    Knowing that LOTW believed and believes that it is called by God to worship on the Main Street Properties, the Village acting by and through the Village Board engaged in a series of discriminatory actions intended to keep LOTW from worshiping on such properties and without any lawful purpose.

222.    Walthill's actions were motivated by its personal and religious animus toward LOTW and/or the religious animus of speakers in public fora.

223.    The Village's statements regarding, and actions toward, the Church violated the required neutrality toward religion mandated by the First Amendment.  Instead, The Village's statements and actions showed a clear and impermissible hostility toward the sincere religious beliefs and practices motivating the Church.

224.    The Village's discriminatory, disparate, and less favorable treatment of the Church in comparison with other religious groups and individuals and with non-religious groups and individuals showed official disapproval of the Church's religious beliefs and practices,

violated the requirement of religious neutrality and showed clear and impermissible hostility toward the Church's religion.

225.    The Village's inappropriate, dismissive and disparaging comments toward the Church's religious beliefs and practices violated the requirement of religious neutrality and showed clear and impermissible hostility toward the Church's religion.

226.    The Village's failure to object to or disavow Village officials' inappropriate, dismissive and disparaging comments toward the Church's religious beliefs and practices violated the requirement of religious neutrality and showed clear and impermissible hostility toward the Church's religion.

227.    The Village's statements and actions were intolerant toward and disrespectful of the Church's religious beliefs and exercise in violation of the requirement of religious neutrality, showing clear and impermissible hostility toward the Church's religion.

228.    The Village's statements and actions passed judgment upon or presupposed the illegitimacy of the Church's religious beliefs and practices in violation of the requirement of religious neutrality, showing clear and impermissible hostility toward the Church's religion.

229.    Walthill's regulations of religious exercise and religious assembly suppress religious worship and assembly.

230.    Walthill's actions and regulations of religious exercise and assembly in general and related to LOTW's Application in particular are and were unconstitutionally under-inclusive.

231.    The Village's conduct, as well as its policies, practices and/or customs, on their face and as applied to LOTW, is and was based on disagreement with and disapproval of LOTW's religion; penalized and discriminated, and penalize and discriminate, against LOTW

37

for its religious beliefs and exercise; and imposed and impose disabilities upon LOTW because of its religion.

232.    The Village's actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, substantially burden and burdened LOTW's sincerely held religious beliefs.

233.    The Village's actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, are not and were not neutral or generally applicable.

234.    The Village's actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, are not and were not neutral toward religion, and target and targeted LOTW's religion and religious exercise for distinctive treatment.

235.    Walthill's regulations of religious exercise and religious assembly serve and served no rational, let alone compelling, interest, and are and were not narrowly tailored, the least restrictive, or rational means to serve a compelling or permissible government interest.

236.    The Village's actions, as well as its policies, practices and/or customs, on their face and as applied to LOTW, implicate and implicated not only LOTW's free exercise rights alone, but also LOTW's free exercise rights in conjunction with other constitutional protections, to include without limitation freedom of speech and equal protection.

237.    The Village's actions had and have no secular purpose or primary secular purpose, are and were carried out with an unlawful hostile purpose, and had and have the effect and primary effect of inhibiting religion.

238.    A reasonable observer of the Village's actions would perceive a message of governmental hostility toward religion, and governmental hostility toward LOTW's religion.

239.    As a direct result of Walthill's violation of LOTW's First Amendment right to the free exercise of religion, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law. LOTW is therefore entitled to injunctive relief.

240.    As a direct result of Walthill's violation of LOTW's First Amendment right to the free exercise of religion, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

**COUNT III**
**DEPRIVATION OF LOTW'S RIGHT TO LIFE, LIBERTY, OR**
**PROPERTY, WITHOUT DUE PROCESS OF LAW AND DENIAL OF EQUAL**
**PROTECTION IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**

241.    LOTW realleges all of the foregoing paragraphs, herein.

242.    The Village discriminated against and treated LOTW differently than other land use applicants and originations on the basis of its religion and its religious beliefs.

243.    The Village's actions, policies, practices and customs infringed upon LOTW's fundamental rights to freedom of religion and freedom of speech, among other fundamental rights.

244.    Other religious and non-religious assemblies and institutions in the Village at all times relevant herein were and are similarly situated to LOTW, to include without limitation the Assembly of God Church and the library.

245.    The Village intentionally and unlawfully targeted and targets LOTW and treated and treats it unequally with other similarly situated religious and non-religious assemblies and institutions on basis of LOTW's religious faith, beliefs, speech, viewpoint, expression, association and/or practices.

246.    Religion is an inherently suspect classification and LOTW is a religious entity.

247.    The Village's policies, practices, customs and actions were and re irrational and unreasonable, impose irrational and unjustifiable restrictions on constitutionally protected speech, assembly, and worship.

248.    The Village's policies, practices, customs and actions serve and served no rational, let alone compelling, government interest, and are not and were not narrowly tailored or the least restrictive means to serve a compelling or permissible government interest.

249.    The Zoning Ordinance contains provisions which are unconstitutionally vague, in that those provisions are not defined sufficiently such as to allow persons of ordinary intelligence to understand the proper meaning of its terms, nor to preclude arbitrary and discriminatory enforcement of its provisions, thereby violating LOTW's due process rights under the Fourteenth Amendment to the United States Constitution.

250.    As a direct result of Walthill's violation of LOTW's Fourteenth Amendment rights to equal protection of the law and due process, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law.  LOTW is therefore entitled to injunctive relief.

251.    As a direct result of Walthill's violation of LOTW's Fourteenth Amendment rights to equal protection of the law and due process, as alleged above, LOTW has suffered and is entitled to recover compensatory and nominal damages, as well as attorney's fees.

**COUNT IV**
**VIOLATION OF RLUIPA: UNLAWFUL SUBSTANTIAL BURDEN**
**42 U.S.C. § 2000cc(a)(1)**

252.    LOTW realleges all of the foregoing paragraphs, herein.

253.    Walthill's land use regulations contained in the Zoning Ordinance, as alleged above, both on their face and as applied to LOTW, imposes and have imposed a substantial burden on the religious exercise of LOTW.

254.    Under the Zoning Ordinance, there is no location in the entire Village in which LOTW may use or construct a building for religious purposes without obtaining a special use permit from the Village.

255.    This special use permit requirement rendered and renders LOTW's ability to exist anywhere within the Village contingent on the approval of the Village and/or its officials.

256.    This special use permit requirement imposed and imposes a substantial burden on the religious exercise of LOTW.

257.    Walthill's reasons for revoking LOTW's building permit and for denying the Church's application for a special use permit are unlawful, unreasonable, unfounded, or otherwise improper.

258.    LOTW has been substantially burdened by continue to be required to meet in an unsafe, inadequate when the Church owns properties on which the Village had previously approved construction of a new Church building and on which LOTW could and would have constructed a new Church building in 2014.

259.    The substantial burden imposed on LOTW's religious exercise is not in furtherance of a compelling governmental interest and is not the least restrictive means of furthering any compelling governmental interest.

260.    Accordingly, Walthill has violated LOTW's rights recognized under federal law as contained in 42 U.S.C. § 2000cc(a) of RLUIPA.

261.    As a direct result of Walthill's violation of the Church's rights under 42 U.S.C. § 2000cc(a) of RLUIPA, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law.  LOTW is therefore entitled to injunctive relief.

262.    Furthermore, as a direct result of Walthill's violation of LOTW's rights under 42 U.S.C. § 2000cc(a) of RLUIPA, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

**COUNT V**
**VIOLATION OF RLUIPA: UNLAWFUL UNEQUAL TREATMENT**
**42 U.S.C. § 2000cc(b)(1)**

263.    LOTW realleges all of the foregoing paragraphs, herein.

264.    The Village's Zoning Ordinance and the Village's application of the Zoning Ordinance to religious assemblies and/or institutions and to LOTW differently, less favorably, and on less than equal terms than to nonreligious or secular assembly uses and assemblies and institutions.

265.    The Village's actions, as well as its Zoning Ordinance and its policies, practices and/or customs, on their face and as applied to LOTW, treated and treat LOTW on less than equal terms with non-religious assemblies or institutions.

266.    Accordingly, Walthill has violated LOTW's rights recognized under federal law as contained in 42 U.S.C. § 2000cc(b)(1) of RLUIPA.

267.    As a direct result of Walthill's violation of the Church's rights under 442 U.S.C. § 2000cc(b)(1) of RLUIPA, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law.  LOTW is therefore entitled to injunctive relief.

268.     Furthermore, as a direct result of Walthill's violation of LOTW's rights under 42 U.S.C. § 2000cc(b)(1) of RLUIPA, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

## COUNT VI
## VIOLATION OF RLUIPA: DISCRIMINATION BASED ON RELIGION OR RELIGIOUS DENOMINATION
## 42 U.S.C. § 2000cc(b)(2)

269.     LOTW realleges all of the foregoing paragraphs, herein.

270.     Walthill has discriminated against religious uses and LOTW by favoring and taking more favorable actions with respect to non-religious uses in comparison to religious uses and particularly to the Church.

271.     Walthill has discriminated against LOTW by favoring and taking more favorable actions with respect to other religious views, opinions, and beliefs than the Village has with respect to LOTW.

272.     Walthill has imposed or implemented a land use regulation that discriminated and discriminates against LOTW on the basis of religion or religious denomination.

273.     Walthill's discriminatory implementation and imposition of its land use regulations as set out herein was and is done on the basis of religion or religious denomination.

274.     Accordingly, Walthill has violated LOTW's rights recognized under federal law as contained in 42 U.S.C. § 2000cc(b)(2) of RLUIPA.

275.     As a direct result of Walthill's violation of the Church's rights under 442 U.S.C. § 2000cc(b)(2) of RLUIPA, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law.  LOTW is therefore entitled to injunctive relief.

276.    Furthermore, as a direct result of Walthill's violation of LOTW's rights under 42 U.S.C. § 2000cc(b)(2) of RLUIPA, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

## COUNT VII
## VIOLATION OF RLUIPA: UNREASONABLE LIMITATION
### 42 U.S.C. § 2000cc(b)(3)

277.    LOTW realleges all of the foregoing paragraphs, herein.

278.    Among other violations, Walthill only allows religious assembly uses on any property in the Village with a special permit which may be granted or withheld based on vague, amorphous standards.

279.    The Zoning Ordinance requires all religious assemblies, including LOTW to obtain special dispensation from Village officials to use land for assembling for religious purposes, affords Village officials unfettered discretion to decide whether to allow religious speech, and does not contain in that process the procedural safeguards necessary for such a permit scheme.

280.    The Zoning Ordinance, on its face and as applied to LOTW, imposes unreasonable limits on LOTW and on religious assemblies, institutions, and structures for worship in Walthill.

281.    The Village Board arbitrary and unnecessarily limited LOTW's use of the Main Street Properties—including on LOTW's attempts to demolish unsafe structures and to construct a new church building—at different times purportedly or actually based on the uninformed opinions of adjacent property owners, the irrelevant opinions of the Omaha Tribe, the religious opinions or discriminatory beliefs of attendees, or for no reason whatsoever.

282.   The Village Board imposed unreasonable limits on LOTW's efforts and attempts to worship and build a church on the Main Street Properties.

283.   Accordingly, Walthill has violated LOTW's rights recognized under federal law as contained in 42 U.S.C. § 2000cc(b)(3) of RLUIPA.

284.   As a direct result of Walthill's violation of the Church's rights under 442 U.S.C. § 2000cc(b)(3) of RLUIPA, as alleged above, LOTW is suffering irreparable harm for which there is no adequate remedy at law.  LOTW is therefore entitled to injunctive relief.

285.   Furthermore, as a direct result of Walthill's violation of LOTW's rights under 42 U.S.C. § 2000cc(b)(3) of RLUIPA, as alleged above, LOTW has suffered harm and is entitled to recover compensatory and nominal damages, as well as attorneys' fees.

## COUNT VIII
### VIOLATION OF THE NEBRASKA OPEN MEETINGS ACT,
### Neb. Rev. St. § 84-1407 to 84-1414

286.    LOTW realleges all of the foregoing paragraphs, herein.

287.   Walthill's Village Board is a public body covered by the Nebraska Open Meetings Act.

288.   All regular, special, or called meetings, formal or informal, of the Village Board, or at least those including a quorum of the Board, are meetings covered by the Open Meetings Act.

289.   Unless otherwise authorized by law, every meeting of a public body in Nebraska shall be open to the public in order that citizens may exercise their democratic privilege of attending and speaking at such meetings.

290.    Meetings of the Village Board may not be closed unless a closed session is clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of an individual and if such individual has not requested a public meeting.

291.    Meetings of the Village Board may not be closed unless the subject matter and the reason necessitating the closed session is identified by the Board or a Board member in the motion to close the Board meeting.

292.    Each public body shall keep minutes of all meetings showing the time, place, members present and absent, and the substance of all matters discussed.

293.    The minutes of all meetings and evidence and documentation received or disclosed in open session shall be public records and open to public inspection during normal business hours.

294.    The Village Board regularly, including as set forth above, closed meetings of the Village Board when it was not clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of an individual.

295.    The Village Board closed meetings without identifying the subject matter and the reason necessitating the closed session.

296.    The Village Board did not keep accurate minutes and made changes intended to falsify minutes or to remove any record of certain actions of the Board.

297.    Among other violations set forth above, the Village Board violated the Opens Meeting Act on September 13, 2017, by closing the Board meeting in the middle of the public hearing regarding LOTW's application for a Special Use Permit when closing the meeting was not clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of an individual.

298.    Among other violations set forth above, the Village Board violated the Opens Meeting Act on September 13, 2017, by closing the Board meeting in the middle of the public hearing regarding LOTW's application for a Special Use Permit when the Village Board closed the meeting without identifying the subject matter and the reason necessitating the closed session.

299.    The Board's closed "executive session" on September 13, 2017, kept LOTW from hearing, speaking against, or refuting the reasons for the Board's denial of its Special Permit

300.    Pursuant to the Open Meetings Act, the Village Board's September 13, 2017, refusal to issue LOTW's requested Special Use Permit must be declared void.

301.    Pursuant to the Open Meetings Act, the Village must be ordered to issue the Special Use Permit that the Board refused to issue on September 13, 2017.

302.    The Board has engaged in a series of continuing violations of the Open Meetings Act, guided and facilitated by the Village attorney.

303.    The Village must be enjoined from further violations of the Opens Meetings Act, including with respect to the continuing practice of unlawfully closing meetings and violations related to meeting minutes.

304.    Pursuant to the Open Meetings Act, LOTW is entitled to attorneys' fees costs and expenses incurred.

## **PRAYER FOR RELIEF**

WHEREFORE, LOTW prays for judgment against Walthill and that this Court:

A.    Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations shall have the force and effect of final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's Orders;

B.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned provisions of the Zoning Ordinance, and to the extent such provisions are not severable, the entire Zoning Ordinance, to be in violation of the First and Fourteenth Amendments to the United States Constitution and RLUIPA;

C.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned unlawful actions of the Village to be in violation of the First and Fourteenth Amendments to the United States Constitution, RLUIPA, and the Nebraska Open Meetings Act;

D.      Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-2(a), (i) permanently enjoin Walthill from enforcing the Zoning Ordinance to the extent that it disallows Churches as a permitted use in any zoning district; (ii) permanently enjoin Walthill from enforcing the Zoning Ordinance to prevent LOTW from using the Main Street Properties for religious worship, assembly, and ministry; and (iii) issue a permanent injunction ordering Walthill to process and issue all demolition, building, occupancy and other permits and grant all other rights and privileges to LOTW to use the Main Street Properties for religious worship, assembly, and ministry as if religious assembly uses were a permitted use;

E.      Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. §2000cc-2(a), award LOTW nominal and compensatory damages;

F.      Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-2(a), FED. R. CIV. P. 54(d) and other applicable law, award LOTW its reasonable attorneys' fees and costs;

G.      Grant such other and further relief as the Court deems equitable, just, and proper; and

H.      LOTW requests trial by jury in Omaha, Nebraska.

Dated:  July 2, 2018

**LIGHT OF THE WORLD GOSPEL
MINISTRIES, INC.**

By   s/ Samuel W. Diehl
Samuel W. Diehl (MN#388371)
Emily E. Mawer (MN#0396329)
**GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.**
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
P:  (612) 632-3000
F:  (612) 632-4095
Samuel.Diehl@gpmlaw.com
Emily.Mawer@gpmlaw.com

-and-

Roger Byron (Tex# 24062643)
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pky., Suite 1600
Plano, TX  75075
972-941-4444
rbyron@firstliberty.org

-and-

Jefferson Downing (Neb.#19280)
**KEATING, O'GARA, NEDVED & PETER,
P.C., L.L.O.**
530 South 13th Street
Suite 100
Lincoln, NE 68508-2795
(402) 475-8230
(402) 475-8328 (fax)
jd@keatinglaw.com

**ATTORNEYS FOR PLAINTIFF LIGHT OF
THE WORLD GOSPEL MINISTRIES, INC.**

GP:4851-8335-0624 v5

## **VERIFICATION OF COMPLAINT**

I, Paul Malcomson, am the Pastor of Plaintiff Light of the World Gospel Ministries, Inc.

I hereby verify that the factual statements contained in this Verified Complaint and its Exhibits

are true and correct to the best of my knowledge and/or information and belief.


                                          s/ Paul Malcomson
                                          Paul Malcomson


Subscribed and Sworn to
this  2   day of July, 2018.


 s/ Anna Danderand
      NOTARY PUBLIC


GP:4851-8335-0624 v6